OPINION
{¶ 1} Defendant-appellant, William L. Rodgers, appeals his convictions for Illegal Manufacture of Drugs, Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs, and Having Weapons While Under Disabilty, following a jury trial *Page 2 
in the Lake County Court of Common Pleas. For the following reasons, we affirm the judgment of the court below.
 {¶ 2} On October 6, 2006, Rodgers was indicted by the Lake County Grand Jury on one count of Illegal Manufacture of Drugs, a felony of the second degree in violation of R.C. 2925.04; one count of Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs, a felony of the third degree in violation of R.C. 2925.041; one count of Illegal Cultivation of Marijuana, a minor misdemeanor in violation of R.C. 2925.04; one count of Having Weapons While Under Disability, a felony of the third degree in violation of R.C. 2923.13(A)(3); one count of Felonious Assault, a felony of the second degree in violation of R.C.2903.11(A)(2); and one count of Domestic Violence, a misdemeanor of the first degree in violation of R.C. 2919.25(A).
 {¶ 3} Rodgers pled not guilty and the matter was tried before a jury between April 23 and 26, 2007. On the State's motion, the trial court dismissed the Felonious Assault and Domestic Violence charges.
 {¶ 4} The following testimony was given at trial. On May 5, 2006, Mentor Police arrested Steven Lao, Amanda Bauer, and Monica Nagy for their involvement in the manufacture of methamphetamine at a Studio 6 hotel in Mentor, Ohio. As a result of information gained from these suspects, the police came to believe that methamphetamine was being produced at a private residence at 8225 Bellflower Road. This property is owned by Angela Jones and her husband. Since June 2005, the Jones leased the property to Rodgers.
 {¶ 5} Bauer had been friends with Rodgers for many years, with whom she often consumed and helped to manufacture methamphetamine. Bauer testified that *Page 3 
8225 Bellflower was a "safe house" that Lao and Joseph Weber, a friend of Rodgers, used to make methamphetamine. Rodgers often purchased the necessary items for its production, such as pseudoephedrine pills, matchbooks, and Heet. She testified they often did "pill pulls," i.e. separate pseudoephedrine from its binder by immersing the pills in a solvent agent, and "did red," i.e. extract the red phosphorous from the strikers on match books also by immersion, at Rodgers' residence. The actual cooking or "gassing," was performed outside by the garage.
 {¶ 6} After her arrest on May 5, 2006, Bauer did not see Rodgers until August 4, 2006. Bauer went to Rodgers' residence to tell him Lao had been sentenced that day. She met Rodgers on the stairs going to the basement and knew, based on the smell coming from the basement, that Rodgers was "cooking dope." Bauer did not enter the basement or actually see the cook.
 {¶ 7} On August 13, 2006, Weber came to Jones and asked for a key to the residence, which Jones refused to provide. Two days later, Rodgers' girlfriend came to Jones and told her that Rodgers had been arrested and that Weber was staying in the house.
 {¶ 8} On August 16, the house at 8225 Bellflower caught fire. Fire investigators determined the fire started when a cigarette discarded by Weber ignited some trash or debris near the rear entrance to the home. In their sweeps of the home, firefighters noticed growing marijuana plants in the basement and a handgun wedged in between the mattress and headboard of a bed on the main floor.
 {¶ 9} A search warrant was obtained and the house was searched by members of the Mentor Police Deparment and Lake County Narcotics Agency. The handgun was *Page 4 
identified as a Smith Wesson 9 millimeter semi-automatic pistol. Rodgers' wallet and other personal effects were found in the bedroom. Other items found in the house included: thousands of matchbooks, a Gatorade bottle converted into a generator for producing hydrogen chloride gas, coffee filters, funnels, pseudoephedrine blister packs with the tablets removed, mason style glass jars, an electric burner, bottles of hydrogen peroxide and isopropyl alcohol, a turkey baster, and latex gloves. Sergeant Bradley Kemp of the Lake County Narcotics Agency testified how each of these items is used in the production of methamphetamine.
 {¶ 10} The jury found Rodgers guilty of the four remaining counts of the indictment.
 {¶ 11} On April 26, 2007, a sentencing hearing was held. Rodgers was sentenced to seven years in prison for Illegal Manufacture of Drugs and five years in prison for Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs to be served concurrently with each other. The trial court merged the Illegal Cultivation of Marijuana charge with the other counts for purposes of sentencing. Rodgers was sentenced to three years in prison for Having Weapons While Under Disability to be served consecutively to the sentence for Illegal Manufacture of Drugs for an aggregate prison term of ten years.
 {¶ 12} Rodgers has filed a delayed appeal and raises the following assignments of error.
 {¶ 13} "[1.] The trial court erred to the prejudice of the defendant-appellant in denying his motion for acquittal made pursuant to Crim.R. 29(A). *Page 5 
 {¶ 14} "[2.] The trial court erred to the prejudice of the defendant-appellant when it returned a verdict of guilty against the manifest weight of the evidence."
 {¶ 15} Rodgers challenges his convictions for Illegal Manufacture of Drugs, Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs, and Having Weapons While Under Disabilty for not being supported by legally sufficient evidence and for being against the weight of the evidence. Accordingly, we will consider Rodgers' arguments as they apply to each particular charge. Rodgers does not appeal his conviction for Cultivation of Marijuana.
 {¶ 16} The Ohio Rules of Criminal Procedure provide that a defendant may move the trial court for a judgment of acquittal "if the evidence is insufficient to sustain a conviction." Crim.R. 29(A). "`[Sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury," i.e. "whether the evidence is legally sufficient to support the jury verdict as a matter of law."State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52, quoting Black's Law Dictionary (6 Ed.1990), 1433. Essentially, "sufficiency is a test of adequacy," that challenges whether the state's evidence has created an issue for the jury to decide regarding each element of the offense. Id.
 {¶ 17} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307, 319. In reviewing the sufficiency of the evidence to support a criminal conviction, "[t]he *Page 6 
relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Jenks, 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 18} Weight of the evidence, in contrast to its sufficiency, involves "the inclination of the greater amount of credible evidence."Thompkins, 78 Ohio St.3d at 387 (emphasis sic) (citation omitted). Whereas the "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support the verdict as a matter of law, * ** weight of the evidence addresses the evidence's effect of inducing belief." State v. Wilson, 113 Ohio St.3d 382,2007-Ohio-2202, at ¶ 25 (citation omitted). "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" Id.
 {¶ 19} Generally, the weight to be given to the evidence and the credibility of the witnesses is primarily for the trier of fact to determine. State v. Thomas (1982), 70 Ohio St.2d 79, at the syllabus. When reviewing a manifest weight challenge, however, the appellate court sits as the "thirteenth juror." Thompkins, 78 Ohio St.3d at 387
(citation omitted). The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175. *Page 7 
 {¶ 20} In order to convict Rodgers of Illegal Manufacture of Drugs, the State had to prove, beyond a reasonable doubt, that Rodgers "between the 1st day of June 2006, and the 13th day of August, 2006, in the City of Mentor * * * knowingly manufacture[d] or otherwise engage[d] in a part of the production of Methamphetamine." Cf. R.C. 2925.04(A).
 {¶ 21} In order to convict Rodgers of Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs, the State had to prove, beyond a reasonable doubt, that Rodgers "between the 1st day of June 2006, and the 13th day of August, 2006, in Lake County * * * knowingly assemble[d] or possessed] one or more chemicals that may be used to manufacture Methamphetamine * * * with the intent to manufacture a controlled substance * * *." Cf. R.C. 2925.041(A).
 {¶ 22} With respect to these two charges, Rodgers claims there was insufficient evidence that he engaged in the necessary conduct during the time stated within the indictment, i.e. between June 1, 2006, and August 13, 2006. The State's witness, Bauer, testified that Rodgers commited numerous acts constituting the manufacture of methamphetamine and the assembly/possession of chemicals necessary to manufacture methamphetamine. Rodgers points out that all the acts witnessed by Bauer occurred before her arrest on May 5, 2006, prior to the time period specified in the indictment. Bauer testified that she had not seen Rodgers engaged in criminal acts relative to methamphetamine since her arrest. Rodgers also points out that Weber was staying in his home several days prior to the fire that destroyed the home. Acknowledging that the State presented a "large amount of evidence" of methamphetamine production, this evidence is insufficient to prove Rodgers' knowledge *Page 8 
of the incriminating items or his actual participation in the production of methamphetamine during the period of time charged in the indictment. We disagree.
 {¶ 23} On August 4, 2006, Bauer visited Rodgers at his residence and "smelled" methamphetamine being produced. As a long-time user of methamphetamine who had also assisted in its production, Bauer testified the smell is "distinctive" and that there was "not doubt" in her mind that Rodgers was producing methamphetamine on August 4, 2006.
 {¶ 24} Whether Bauer's testimony that she smelled methamphetamine being "cooked" is, by itself, sufficient to sustain a conviction for Manufacture or Assembly/Possession is a question we need not answer. In the present case, there is other evidence of Rodgers' participation in the manufacture and assembly of methamphetamine between June 1, 2006, and August 13, 2006. In a statement made to Sergeant Kemp on August 17, 2006, Rodgers admitted that he had cooked methamphetamine at 8225 Bellflower within a week prior to the fire on August 16. The State also introduced the pharmacy logs from Walgreen's Pharmacy on Vine Street in Eastlake indicating that Rodgers had purchased pseudoephedrine tablets (Actifed and EQ Suphedrin) on July 7 and August 2, 2006, and from Wal-Mart on North Ridge Road in Madison, indicating that he had purchased pseudoephdrine tablets (Actifed) on June 23, 2006. Empty packets of these drugs were found at Rodgers' residence.
 {¶ 25} In the house and garbage bags found in the garage, police recovered numerous items assoicated with the "red phosphorous" method of methamphetamine production. Some of these bags contained receipts bearing Rodgers' name and dated from July 2006. *Page 9 
 {¶ 26} This evidence is sufficient to support convictions of Illegal Manufacture of Drugs and Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs within the time period specified in the indictment.
 {¶ 27} Rodgers' argument that his convictions are against the weight of the evidence is based on the evidence that he had been in jail for three days prior to the fire, during which time another known methamphetamine manufacturer, Weber, was staying in his home. Again, we disagree.
 {¶ 28} Sergeant Kemp testified about the different "recipes" used for cooking methamphetamine. The red phosphorous method is distinctive because it requires the use of red phosphorous, typically found in the striker plates of matchbooks. The phosphorous is commonly extracted from the striker plates by immersing the plates in isopropyl alcohol. Thousands of matchbooks and isoprophyl alcohol were found in Rodgers' residence. Kemp testified it takes between 24 and 48 hours to create methamphetamine using the red phosphorous method. Kemp also testified that it would have taken longer than three days, the number of days Rodgers was absent from his residence prior to the fire, to produce the amount of methamphetamine byproduct recovered from Rodgers' residence. Kemp testified the Gatorade bottle used as a gas generator found in the residence had salt components in it, which indicated a completed cook was done relatively recently.
 {¶ 29} Bauer testified that she was familiar with Rodgers and Weber's methods of producing methamphetamine. Bauer described Weber as a "cold cook," i.e. he used lithium battery strips and anhydrous ammonia to generate the methamphetamine, and she described his methamphetamine as "junk." Rodgers, however, "took his time" using *Page 10 
the red phosphorous method of production. Thus, Rodgers' methamphetamine was "really good and clean." The physical evidence from the residence only demonstrates the red phosphorous method of production, which takes longer and which Rodgers was known for using.
 {¶ 30} Accordingly, Rodgers' convictions for Illegal Manufacture of Drugs and Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs are not against the weight of the evidence.
 {¶ 31} In order to convict Rodgers of Having Weapons While Under Disability, the State had to prove, beyond a reasonable doubt, that on or about August 16, 2006, Rodgers, "having been convicted of * * * Possession of Marijuana * * * did knowingly acquire, have, carry, or use a firearm, * * * a Smith Wesson 9 mm pistol." Cf. R.C. 2923.13(A)(3). A "firearm" is defined as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or comubstible propellant." R.C. 2923.11(B)(1).
 {¶ 32} With respect to this charge, Rodgers challenges the State's evidence demonstrating that the Smith Wesson found at 8225 Bellflower was his and was operable.
 {¶ 33} The Smith Wesson was found in a house leased by Rodgers alone, under the headboard of the bed in a room where Rodgers' clothes, wallet, and other personal effects were located. This evidence is sufficient to show that the Smith Wesson was in Rodgers' constructive possession. State v. Cherry, 171 Ohio App.3d 375, 2007-Ohio-2133, at ¶ 10 ("[constructive possession can be sufficient to support a charge of Having Weapons Under Disability"). *Page 11 
 {¶ 34} Rodgers argues the inference that the Smith Wesson is his is against the weight of the evidence. Rodgers points out that he denied ownership of the weapon to Sergeant Kemp, his fingerprints were not found on the weapon, and no magazine or ammunition for the weapon was found on the property. Bauer testified that she had seen Rodgers with a gun, but was unable to identify the Smith Wesson as the gun she had seen. Finally, Rodgers emphasizes that Weber, a known methamphetamine producer, was staying at the residence for three days while Rodgers was in jail.
 {¶ 35} Rodgers relies upon the case of State v. Weber (Mar. 24, 2000), 2nd Dist. No. 17800, 2000 Ohio App. LEXIS 1150, for the proposition that "where the only evidence linking a defendant to the contraband is his ownership or leasing of the property, this is not sufficient to establish constructive possession." Id. at *14. In Weber, appellant's convictions for Having Weapons Under Disability and other charges stemming from his constructive possession of contraband were overturned for insufficient evidence. The court noted the only evidence linking appellant to the contraband was his status as lessee of the property, other tenants of the residence had access to the rooms where the contraband was found, appellant had been away from the residence for several days, and there was no forensic evidence linking appellant to any of the contraband. Id. at *14-*15.
 {¶ 36} Weber is distinguishable in several important respects. In that case, the appellant was not the sole tenant of the premises and the rooms in which the contraband was found were accessible to other persons, many of whom claimed *Page 12 
ownership of the contraband.[1] In the present case, Bauer testified that she had seen Rodgers in possession of a firearm at 8225 Bellflower, and that he had threatened to use the weapon. Although Weber had been staying at the residence in Rodgers' absence, there is evidence that Weber was not staying in Rodgers' bedroom. When the house caught fire, Weber was sleeping and had to escape through the bedroom window, which was not the bedroom where the Smith Wesson was found. For these reasons, the conclusion that the Smith Wesson belonged to Rodgers is not against the weight of the evidence.
 {¶ 37} Rodgers also claims the State failed to prove the weapon was operable. Since no magazine or ammunition was found at the premises, Rodgers asserts there was no evidence the Smith Wesson could have readily been rendered operable at the time of the offense.
 {¶ 38} At trial, Mitchell Wisniewski, a firearms examiner for the Lake County Crime Laboratory, testified that he had tested the Smith Wesson and that it was capable of firing bullets. Wisniewski also testified that, although the Smith Wesson is designed to be fired with a clip, it is capable of being fired without one. Included within the definition of a "firearm" is "an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C.2923.11(B)(1).
 {¶ 39} Contrary to Rodgers' position, the mere absence of readily available ammunition does not render a firearm inoperable. State v.Terzo, 12th Dist. No. CA2002-08-194, 2003-Ohio-5983, at ¶¶ 10-12
(conviction for carrying a "firearm" while *Page 13 
under the influence of alcohol upheld where the gun was found to be unloaded and no ammunition was found on the premises); State v.Gainer, 8th Dist. No. 81366, 2004-Ohio-2393, at ¶ 17 ("firearm" deemed operable when test-fired by police using "police bullets" rather than the ammunition found on the defendant).
 {¶ 40} Assuming, arguendo, that the absence of a clip rendered the weapon inoperable, Wisniewski testified it could be rendered operable by simply inserting a bullet directly into the chamber.
 {¶ 41} Thus, Rodgers' conviction for Having Weapons While Under Disability is supported by sufficient evidence and is not against the weight of the evidence.
 {¶ 42} For the foregoing reasons, Rodgers' assignments of error are without merit.
 {¶ 43} Rodgers' convictions for Illegal Manufacture of Drugs, Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs, and Having Weapons While Under Disabilty in the Lake County Court of Common Pleas are affirmed. Costs to be taxed against appellant.
CYNTHIA WESTCOTT RICE, J., TIMOTHY P. CANNON, J., concur.
[1] Although Weber is purportedly decided on the basis of the sufficiency of the evidence, the amount of direct testimony exonerating the appellant of wrongdoing suggests the decision might have been better decided on the basis of the manifest weight of the evidence. *Page 1